139 Nev., Advance Opinion 54

IN THE COURT OF APPEALS OF THE STATE OF NEVADA

MARIA LOPEZ,
Appellant,
vs.
PEDRO LOPEZ,
Respondent.

No. 84950-COA

FILED

NOV 30 2023

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court decree of divorce. Eighth Judicial District Court, Family Division, Clark County; Dawn Throne, Judge.

*Affirmed.*

McFarling Law Group and Emily McFarling, Las Vegas,
for Appellant.

Leavitt Law Firm and Dennis M. Leavitt and Frank A. Leavitt, Las Vegas,
for Respondent.

BEFORE THE COURT OF APPEALS, GIBBONS, C.J., and BULLA and WESTBROOK, JJ.

*OPINION*

By the Court, GIBBONS, C.J.:

In this appeal, we examine the district court's authority in a divorce action to resolve community property disputes over property held in a revocable inter vivos trust. Our analysis brings us to an issue of first impression: whether a revocable inter vivos trust holding community property must be named as a necessary party in a divorce action where the

23-38824

divorcing spouses are co-trustees, co-settlors, and beneficiaries. Because we conclude that the spouses are the materially interested parties, and that divorce revokes every devise given by a settlor to their former spouse in a revocable inter vivos trust, we hold that the parties are not required to name such a revocable inter vivos trust as a necessary party in a divorce action where the spouses are co-settlors, co-trustees, and beneficiaries. We accordingly uphold the district court's distribution decisions and, ultimately, affirm its decree of divorce.

## FACTS AND PROCEDURAL HISTORY

Appellant Maria Lopez and respondent Pedro Lopez were married in Mexico in 1995. After they were married, the parties moved to the United States and created the P & D Family Trust, a revocable inter vivos trust over which they, as co-settlors and co-trustees, retained the right to revoke, alter, or amend at any point during their lifetimes.[1] During their marriage, the parties collectively placed eight properties into the P & D Family Trust. Of those eight properties, Maria and Pedro had jointly purchased seven; they rented out six and used one as their marital residence. Maria's father purchased the eighth property and gave it to Maria's brother. That property is currently titled in the name of both Maria's brother and the family trust.[2] Maria, a licensed realtor, managed the six rental properties and oversaw rent collection.

---

[1]Maria and Pedro, and their children in the co-trustees' discretion, are the trust beneficiaries.

[2]The district court excluded this jointly titled property from its community property distributions, and we therefore do not include it in our references to trust property.

Around 2008, Maria and Pedro defaulted on their mortgage payments for three of the trust properties that they controlled (Grizzly Forest, Abrams Avenue, and San Gervasio). After defaulting, Maria and Pedro sold Grizzly Forest and Abrams Avenue via short sales to third-party buyers with whom they had close relationships, and they financed these short sales with personal funds. Specifically, Maria and Pedro gave Maria's sister $280,000 to purchase Grizzly Forest and a close family friend $80,000 to purchase Abrams Avenue. Maria contends that the funds came from her separate property, while Pedro argues that the funds came from their community assets. Almost immediately after Maria's sister and the parties' friend purchased the properties, they gifted the properties back to Maria, in her name alone, titled as her sole and separate property. As to San Gervasio, Maria alleges that she used her inheritance to pay off the mortgage, after which Pedro signed over his community interest in the property to Maria.[3] Pedro denies conveying his interest in San Gervasio to Maria and alleges that Maria forged his signature on the deed.[4]

Throughout the parties' marriage, Maria and Pedro each maintained separate and joint bank accounts. The parties, particularly Maria, were neither forthcoming nor transparent regarding their funds—

_____

[3]In its decree of divorce, the district court referred to Maria as San Gervasio's short sale buyer. However, it is undisputed that Maria paid off the San Gervasio mortgage and did not purchase the property via a short sale. Thus, the court's characterization of Maria as a short sale buyer is inaccurate, but this does not change our analysis or conclusion.

[4]At trial, the district court questioned Pedro regarding a grant, bargain, and sale deed that purported to convey Pedro's interest in San Gervasio to Maria. Notably, however, the record does not contain this deed. The only San Gervasio deed in the record is a subsequent quitclaim deed that Maria signed but Pedro did not.

each made several transfers from the joint accounts to their separate accounts without telling the other. Shortly before the divorce, Maria also deviated from her historical practice of depositing rental payments into the parties' joint accounts and instead began placing the proceeds in her separate accounts.

Pedro filed for divorce in April 2021. During the case management conference (CMC), the district court urged the parties to comply with their mandatory NRCP 16.2 financial disclosure requirements and produce accurate and thorough financial disclosure forms (FDFs).[5] Throughout the CMC and later hearings, Maria represented that the Grizzly Forest, Abrams Avenue, and San Gervasio properties were her separate property and should not be included in the court's community property distribution decisions. She also argued that the district court did

---

[5]Pursuant to NRCP 16.2(c)(1), each party must complete, file, and serve a General Financial Disclosure Form "within 30 days of service of the summons and complaint, unless" the court requires, or the parties request, a Detailed Financial Disclosure Form (DFDF) pursuant to 16.2(c)(2). Here, the district court did not require, and the parties did not request, a DFDF, but NRCP 16.2 and the court's admonitions subjected the parties to relevant discovery. Concurrent with the filing of the financial disclosure form, each party must also provide "financial statement(s), document(s), receipt(s), or other information or evidence relied upon to support the figure represented on the form." NRCP 16.2(d)(2). Specifically, each "party must provide copies of all monthly or periodic bank, checking, savings, brokerage, investment, cryptocurrency, and security account statements in which any party has . . . an interest," as well as "credit card [and] debt statements," real property documents, property debt statements, loan applications, promissory notes, deposits, receivables, retirement assets, insurance and insurance policies, the values of all real property, tax returns, proof of income, personalty, and "a copy of every other document or exhibit . . . that a party expects to offer as evidence at trial in any manner." NRCP 16.2(d)(3)(A)-(P).

not have the authority to make distributions of the family trust's assets because it did not have jurisdiction over the family trust. Additionally, Maria claimed a prenuptial agreement existed that the parties signed in Mexico; the agreement supposedly demonstrated that Maria had $80,000 in personal savings and a $250,000 inheritance from her father that were to remain her separate property throughout the marriage. Pedro denied the agreement's existence and expressed his concern that Maria would attempt to fabricate a document with her sister, an attorney in Mexico, to use at trial. The district court repeatedly cautioned Maria that she would need to produce the prenuptial agreement before trial with an official translation for the court to admit it into evidence. The district court also expressed frustration that neither party had engaged in sufficient discovery; subpoenaed bank records; or obtained formal appraisals for their real property, which at that point had approximately $3 million in equity.

Prior to trial, the district court held a hearing to resolve all pending motions. At that hearing, the district court found that both Maria's and Pedro's FDFs were inadequate and did not provide the court with a sufficient basis from which it could distribute the parties' community assets. The district court noted that any party claiming family trust property to be his or her separate property would need to overcome the presumption of community property by clear and convincing evidence. The district court also acknowledged Pedro's concern that Maria had yet to produce the prenuptial agreement.

At trial, Maria argued that the Grizzly Forest, Abrams Avenue, and San Gervasio properties were her separate property because she financed the Grizzly Forest and Abrams Avenue short sales with separate property and paid off the San Gervasio mortgage with funds from her

inheritance. The district court was unconvinced and found that Maria had not produced adequate tracing evidence (through her NRCP 16.2 disclosures or otherwise) sufficient to show that the funds used to finance the short sales and pay off the mortgage came from anywhere other than the parties' community assets.[6] The district court also conveyed its strong belief that the parties had used "straw-buyers" to engage in mortgage fraud. The judge emphasized her distaste for the parties' behavior and expressed her distrust for both parties.

During Maria's cross-examination of Pedro, she questioned him about the alleged prenuptial agreement, and Pedro flatly denied its existence. After Pedro's denial, Maria proffered an unsigned physical document, written in Spanish, purporting to be a copy of the alleged prenuptial agreement. Pedro objected to its admission, and Maria responded that she had been able to obtain the document from Mexico only two days before trial. Maria did not explain why she did not disclose the document to Pedro in those two days or how she was finally able to procure it. Pedro argued that the document was untimely and not properly authenticated. The district court agreed, stating that because Maria had not produced the document prior to trial as the court had instructed, and because the document was in Spanish, with no signatures, and without any translation, the document was inadmissible. The district court explained that allowing Maria to cross-examine Pedro on an unproduced document

---

[6]The district court also found that all assets in both parties' bank accounts were community property because the accounts were created after the marriage, there was significant commingling of community and alleged separate funds in the accounts, and there was no tracing evidence to distinguish the alleged separate funds.

that had not been properly authenticated or translated would amount to trial by ambush.

When questioning Maria about the bank accounts, the district court instructed Maria to open and display her online banking information, which revealed that Maria had understated the total amount in the accounts by almost $342,000 during her testimony.[7] The district court called this a material misrepresentation that Maria made in an attempt to defraud Pedro.

In its findings of fact, conclusions of law, and decree of divorce, the district court deemed all family trust properties to be community property and ordered them distributed equally between the parties because neither party offered a compelling reason for an unequal distribution. This appeal followed.

## ANALYSIS

On appeal, Maria argues that the district court (1) did not have authority to distribute the P & D Family Trust's assets; (2) made an unequal distribution of property and abused its discretion because it distributed the Grizzly Forest, Abrams Avenue, and San Gervasio properties as community property and not Maria's separate property; and (3) abused its discretion when it did not allow Maria to question Pedro on cross-examination about the alleged prenuptial agreement. Maria also claims (4) that, on remand,

---

[7]Maria claimed at trial that one of her separate accounts had around $80,000 in it and that her other separate account had $10,000 in it. However, at trial, the district court challenged Maria to reveal her online banking records, which showed that her accounts contained $311,839 and $120,115, respectively.

this case should be reassigned to a new judge because of alleged prejudicial comments the district court judge made during the trial.[8]

*The district court had authority to distribute the P & D Family Trust's assets*

Maria argues that the district court erred when it exercised authority over the family trust's assets. Because the trust was a revocable inter vivos trust established after marriage, and the parties were co-settlors, co-trustees, and beneficiaries, we conclude that the district court did not err in concluding it had authority to distribute trust assets.

*The trust's distributions were immediately revoked upon divorce*

Maria argues that the district court did not have authority to distribute the family trust's assets because the trust was not irrevocable. Pedro responds that the family trust was revocable upon divorce and that the district court automatically had authority to distribute the community assets in the family trust upon its revocation.

NRS 111.781(1) establishes that unless "otherwise provided by the express terms of a governing instrument," divorce revokes any revocable disposition of property made to a former spouse, including dispositions made pursuant to a trust. *In re Colman Family Revocable Living Tr., Dated June 23, 2011*, 136 Nev. 112, 113-14, 460 P.3d 452, 454 (2020) (summarizing

---

[8]Maria additionally argues that the district court abused its discretion when it used Zillow estimates that Pedro presented instead of actual appraisal values as the basis for its property valuations. However, despite the district court's pretrial warnings that without appraisal values it would be forced to either order the sale of the properties and divide the proceeds or use Zillow estimates in lieu of appraisals, neither party obtained appraisal values for trial. At trial, therefore, the parties stipulated to the use of Zillow estimates to avoid the sale of the properties. Maria, a licensed realtor, also declined to offer her opinion on the value of the properties. Thus, we conclude that the district court did not abuse its discretion by using the Zillow estimates.

NRS 111.781); *see also* NRS 163.565 (stating that unless otherwise provided, divorce "revokes every devise, beneficial interest or designation to serve as trustee given by the settlor to the former spouse of the settlor in a revocable inter vivos trust"); NRS 133.115 (stating the same as applied to wills—namely, that divorce operates to revoke "every devise, beneficial interest or designation to serve as personal representative given to the testator's former spouse in a will"). The theory underlying this principle is that revocable trusts with dispositions between spouses generally become ineffective once there remains no surviving spouse to benefit post-divorce. *See Colman*, 136 Nev. at 112-13, 460 P.3d at 453. NRS 125.150(1)(b) additionally grants courts in divorce actions express authority to make equal dispositions of any community property transferred into irrevocable trusts, which by their nature are much more restrictive than inter vivos trusts.

Here, the parties did not offer the family trust as an exhibit at trial, nor does it appear in the record on appeal, and we cannot verify its provisions. Regardless, neither party argues that the trust's express terms would have precluded the district court from removing and distributing the family trust's community property. Instead, Maria contends that, pursuant to NRS 111.781 and NRS 125.150, district courts have express authority to distribute community assets placed in irrevocable trusts but not those placed in revocable inter vivos trusts. Yet, Maria's argument fails to account for the distinct nature of revocable inter vivos trusts that makes these statutes inapplicable. Unlike property transferred to irrevocable trusts—and in contrast to the general principle that settlors no longer own trust property once they transfer that property into a trust—property transferred to or held in a revocable inter vivos trust is considered to remain

Court of Appeals
of
Nevada

(O) 1947B

9

with the settlor because "any interest of other beneficiaries is purely potential and can evaporate at the settlor's whim." 90 C.J.S. *Trusts* § 254 (2020) (also noting that a "settlor may be the owner of property in a revocable trust of which the settlor is the trustee"); *see also Linthicum v. Rudi*, 122 Nev. 1452, 1453, 148 P.3d 746, 747 (2006) (concluding that "a beneficiary's interest in a revocable inter vivos trust is contingent at most"); *see, e.g., Wishengrad v. Carrington Mortg. Servs.*, 139 Nev., Adv. Op. 13, 529 P.3d 880, 886 (2023) (noting that, with respect to real property held in a revocable inter vivos trust, the trustees "hold legal title" and the beneficiaries "are the equitable owners"). Further, dispositions between spouses from a revocable trust are immediately revoked upon divorce unless the instrument expressly states otherwise. *Colman*, 136 Nev. at 114, 460 P.3d at 454. Thus, the district court automatically assumed the authority to distribute the family trust's community assets contemporaneous with Maria and Pedro's divorce.

*The trust was not a necessary party to the divorce action*

Maria also implies that the family trust should have been joined as a necessary party in order to distribute the trust's assets. NRCP 19 requires that all necessary parties be joined in an action, so long as the party's joinder does not deprive the court of subject matter jurisdiction. A necessary party includes a party without whom the court cannot accord complete relief and a party whose interest in the action is such that the party's ability to protect its interests will be impeded if that party is not joined. NRCP 19(a)(1).

In a divorce action, the spouses are the materially interested parties. Where the spouses are the co-settlors, co-trustees, and beneficiaries of a revocable inter vivos trust, the court's distribution of the trust's joint assets will not impede the trust's interests because the

COURT OF APPEALS
OF
NEVADA

(O) 1947B

10

necessary parties are already named in the litigation.[9] *See, e.g., Tsai v. Hsu*, No. 50549, 2010 WL 3270973, at *4-5 (Nev. Apr. 29, 2010) (Order of Affirmance) (concluding that a revocable inter vivos trust between spouses was not a necessary party to a divorce proceeding because the husband and wife (both co-trustees) were already parties to the litigation, and the district court's distribution of the trust's assets did not substantially affect the rights of nonparties).

Here, neither Pedro nor Maria filed a motion under NRCP 19 to join the trust separately as a necessary party, and this court is therefore not required to consider the argument on appeal. *Diamond Enters., Inc. v. Lau*, 113 Nev. 1376, 1378, 951 P.2d 73, 74 (1997); *see also Rose, LLC v. Treasure Island, LLC*, 135 Nev. 145, 152-53, 445 P.3d 860, 866-67 (Ct. App. 2019) (noting that in contrast to federal courts, Nevada permits parties to raise NRCP 19 challenges for the first time on appeal, but only so long as the parties raise the challenges in good faith and not merely in response to an adverse ruling).

However, even if considered on the merits, the trust in this case is not a necessary party to the action because Maria and Pedro, like the co-trustees in *Tsai*, were both existing parties to the divorce action and the trust's co-trustees, co-settlors, and beneficiaries. The parties' status as co-trustees is particularly noteworthy. Legal proceedings involving a trust must be "brought by or against the trustees in their own name[s]."

---

[9]This case does not present a situation where the revocable inter vivos trust's settlor(s), trustee(s), and beneficiary(ies) are unnamed third parties who may have an interest in the trust's assets if that trust were to become subject to litigation. We therefore need not address whether a revocable inter vivos trust would be a necessary party to divorce litigation in that scenario.

*Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 383 (2016). Consequently, to join the trust would require naming Maria or Pedro in their co-trustee capacities, which would be redundant because Maria and Pedro were already parties to the litigation. *See id.*

Joining the family trust was also not a prerequisite for complete relief, as neither Maria's nor Pedro's interests were impeded by not naming the family trust as a separate party. In fact, the district court's disposition of the trust's assets was a necessary part of the divorce's execution because all revocable distributions between Maria and Pedro in the family trust were revoked upon divorce. *See* NRS 111.781(1). Thus, we conclude that the family trust was not a necessary party and failing to name the family trust in the action did not preclude the district court's ability to distribute the trust's assets.[10]

Accordingly, we conclude that the district court had authority to distribute the family trust's assets because the divorce revoked the trust's distributions between Maria and Pedro, Maria and Pedro were the co-settlors, co-trustees, and beneficiaries, and the trust was not a necessary party.[11]

---

[10]This conclusion is consistent with trust law, in which the United States Supreme Court has clarified that "[t]raditionally, a trust was not considered a distinct legal entity, but a 'fiduciary relationship' between multiple people." *See Americold*, 577 U.S. at 383 (quoting *Klein v. Bryer*, 177 A.2d 412, 413 (Md. 1962)).

[11]Maria also argues that the district court did not have authority to distribute the family trust's assets because the trust was not a named party pursuant to *Klabacka v. Nelson*, 133 Nev. 164, 394 P.3d 940 (2017). We conclude that *Klabacka* is inapposite. *Klabacka* involved the jurisdictional issue of whether a district court judge sitting in the family division had subject matter jurisdiction over the divorcing parties' irrevocable self-

*The district court did not make an unequal distribution or abuse its discretion when it distributed Grizzly Forest, Abrams Avenue, and San Gervasio as community property*

Maria argues that the district court abused its discretion when it deemed three trust properties that were allegedly purchased with her separate property funds to be community property and then distributed those properties as community assets. By doing so, Maria contends that the court made an unequal distribution without a compelling reason. Because Maria and Pedro purchased the properties while they were married and Maria failed to overcome the community presumption by clear and convincing evidence, we conclude that the district court did not abuse its discretion—or make an unequal distribution—by distributing the three disputed properties as community property.[12]

---

settled spendthrift trusts (SSSTs). *Id.* at 169, 394 P.3d at 945. Irrevocable SSSTs are afforded special statutory protection in Nevada and are subject to specialized proceedings that make them wholly distinct from the revocable inter vivos trust at issue here. *Id.* at 173, 394 P.3d at 948. Additionally, *Klabacka* is factually distinct from this case because the parties in *Klabacka* voluntarily added the SSSTs as necessary parties in their divorce proceeding. *Id.* at 165, 394 P.3d at 943. Consequently, *Klabacka* has no bearing on whether the district court in this case acted properly in distributing the family trust's assets, and we reject this portion of Maria's argument.

[12]Maria also argues that the district court abused its discretion when it included two of her separate bank accounts as part of its equalization payment. We conclude that the district court did not abuse its discretion in including those accounts in the equalization payment primarily for the same reason she could not overcome the community presumption for the disputed properties—namely, as will be discussed below, the district court could reasonably find that insufficient evidence supports a finding of separate funds. Maria's evidence to support a separate property finding is the fact that the accounts were titled in her name. However, an account's titling is not determinative of the character of the funds contained therein,

*All P & D Family Trust properties were community property*

Maria and Pedro purchased the properties in the family trust jointly during their marriage, which raises a presumption that the properties are community property. *See* NRS 123.220(1). Maria, however, alleges that three of the properties—Grizzly Forest, Abrams Avenue, and San Gervasio—were gifted to her by the new purchasers as separate property prior to the parties' divorce. To that end, Maria argues that it was Pedro's burden to show that these three properties were transmuted back to community property from separate property. Pedro argues that Maria is attempting to improperly shift the burden to him to prove transmutation and that the burden is instead on Maria to overcome the initial presumption of community property by clear and convincing evidence. We agree with Pedro and conclude that the district court could reasonably find that Maria did not meet her burden to overcome the initial presumption of community property.

Properties acquired during marriage are presumed to be community property, and this presumption can be overcome only by clear and convincing evidence. *Todkill v. Todkill*, 88 Nev. 231, 236, 495 P.2d 629, 631-32 (1972). Regarding marital rights, we will uphold the district court's property characterizations, so long as those characterizations are supported by substantial evidence. *Waldman v. Maini*, 124 Nev. 1121, 1128, 195 P.3d 850, 855 (2008).

---

and a separate account may contain solely community assets if there is no tracing evidence to support otherwise. *See Peters v. Peters*, 92 Nev. 687, 690, 557 P.2d 713, 715 (1976). Other than her contested testimony, Maria adduced no evidence that the funds contained anything but community funds; therefore, the accounts were properly characterized as community property.

NRS 123.220(1) provides that "[a]ll property, other than [separate property outlined] in NRS 123.130, acquired after marriage by either spouse or both spouses, is community property unless otherwise provided by . . . [a]n agreement in writing between the spouses." When reviewing tracing evidence to support a finding of separate property, function takes precedence over form, and nominal changes from community to separate property are not, without additional evidence, enough to overcome the initial presumption of community property. *See Peters v. Peters*, 92 Nev. 687, 690, 557 P.2d 713, 715 (1976). The appearance of a signature on a stock transfer, for example, is not evidence of transmutation from community to separate property without additional evidence. *See Sprenger v. Sprenger*, 110 Nev. 855, 858, 878 P.2d 284, 286-87 (1994).

Regarding real property, sufficient tracing evidence requires a party to prove the source of purchasing funds by clear and convincing evidence. *See Colman*, 136 Nev. at 114, 460 P.3d at 454 (citing *Verheyden v. Verheyden*, 104 Nev. 342, 344-45, 757 P.2d 1328, 1330-31 (1988)). To that end, even a deed that places title in one spouse as that spouse's separate property is insufficient to overcome the community presumption if the party cannot also show that the home was purchased with separate funds. *Pascua v. Bayview Loan Servicing, LLC*, 135 Nev. 29, 33, 434 P.3d 287, 290 (2019); *see also Pryor v. Pryor*, 103 Nev. 148, 150, 734 P.2d 718, 719 (1987) (holding that a deed reciting that a husband owned his estate as separate property was not, of itself, enough to overcome the community presumption).

Here, it is undisputed that the parties originally purchased the properties jointly—with community funds—during their marriage, which raises a presumption that the properties are community property. Thus, Maria had the burden to overcome the community presumption by clear and

convincing evidence. In reviewing the record, the district court's determinations will be upheld if they are supported by substantial evidence, and when "conflicting evidence exists, all favorable inferences must be drawn towards the prevailing party." *Quintero v. McDonald*, 116 Nev. 1181, 1183, 14 P.3d 522, 523 (2000) (quoting *Yamaha Motor Co., U.S.A. v. Arnoult*, 114 Nev. 233, 238, 955 P.2d 661, 664 (1998)).

As noted above, when Maria and Pedro defaulted on the mortgages for three properties around 2008, they sold Grizzly Forest and Abrams Avenue via short sales to third-party buyers who then gifted the properties back to Maria as Maria's "sole and separate property." Maria and Pedro financed those third-party purchases with their personal funds; however, Maria argues that these funds came from her separate property, and Pedro counters that the sales were financed with community assets.

To overcome the community property presumption, Maria needed to show at the outset that the funds used to purchase the properties at the short sales came from her separate property. However, Maria did not proffer any tracing evidence, either during discovery or trial, sufficient to show that her separate funds financed the short sales. If anything, the parties' banking records show significantly commingled funds, with both Maria and Pedro consistently transferring joint account funds to their separate accounts. "Once an owner of separate property funds commingles these funds with community funds, the owner assumes the burden of rebutting the presumption that all the funds in the account are community property." *See Malmquist v. Malmquist*, 106 Nev. 231, 245, 792 P.2d 372, 381 (1990). Maria's FDFs failed to adequately account for her assets and debts, and, as will be addressed below, the alleged prenuptial agreement was inadmissible to support her separate property claims. The district

court also determined that all assets in every bank account—both joint and separate—belonged to the community.

Additionally, because substantial evidence supports the district court's findings that community funds financed the short sales, the fact that the third-party buyers gifted the properties back to Maria as her "sole and separate property" is of little consequence. Function takes precedence over form, and without proof that the funds used to purchase the properties came from a separate property source, nominally titling the properties as Maria's separate property was insufficient for Maria to overcome the community presumption. *See Peters*, 92 Nev. at 690, 557 P.2d at 715. This conclusion is particularly relevant in this case because the district court found that the third parties who purchased the homes were "straw buyers" who facilitated the nominal changes in title.

As to San Gervasio, Maria alleges that she paid off the mortgage with inherited funds and that, after the mortgage was satisfied, Pedro transferred his interest in the property to Maria. Pedro disputes the validity of the deed and argues that his signature was forged, as he testified at trial. The same findings that applied to Grizzly Forest and Abrams Avenue regarding the insufficiency of Maria's tracing evidence apply to San Gervasio as well. The district court determined that Maria used community funds to pay off the San Gervasio mortgage and that Pedro's testimony was more credible than Maria's at trial.[13] Given Maria's lack of tracing

---

[13]To support its credibility determinations, the district court found that Pedro's testimony regarding the rental payment structure aligned with the banking records, while Maria's did not, and that Maria materially misrepresented the funds in her bank accounts. We will not reweigh the district court's witness credibility determinations on appeal. *See Castle v. Simmons*, 120 Nev. 98, 103, 86 P.3d 1042, 1046 (2004).

evidence, coupled with the district court's credibility determinations and conclusion that Pedro did not voluntarily relinquish his community interest to Maria, there is substantial evidence to support the finding that the funds used to finance the two short sale purchases and pay off the San Gervasio mortgage were derived from community assets.

Accordingly, we conclude that the district court did not abuse its discretion by characterizing the Grizzly Forest, Abrams Avenue, and San Gervasio properties as community property because its determinations are supported by substantial evidence that Maria failed to overcome the initial community property presumption. Therefore, because all of the property was community property, Maria's argument that the district court made an unequal distribution absent a compelling reason necessarily fails.

*The district court did not abuse its discretion when it disallowed questioning about the alleged prenuptial agreement*

Maria argues that the district court erred when it denied her the opportunity to question Pedro about the alleged prenuptial agreement on cross-examination because it was corroborative of her claims regarding her separate property, and once Pedro denied the agreement's existence, the alleged prenuptial agreement was admissible as evidence of a prior inconsistent statement. Pedro responds that the alleged prenuptial agreement was not properly authenticated and that to permit questioning about the agreement would have amounted to trial by ambush. Additionally, Pedro asserts that because Maria did not attempt to introduce the alleged agreement as a prior inconsistent statement at trial, this court need not consider that portion of her argument on appeal. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) (explaining that issues not argued below are "deemed to have been waived and will not be considered on appeal"). We agree with Pedro on all accounts.

*The alleged prenuptial agreement was not properly authenticated*

Proper authentication or identification is a condition precedent to admissibility and requires the proponent to show that the documentary evidence is what the proponent claims it to be. NRS 52.015(1). "[W]e review a district court's decision to admit or exclude evidence for abuse of discretion." *M.C. Multi-Family Dev., LLC v. Crestdale Assocs., Ltd.*, 124 Nev. 901, 915, 193 P.3d 536, 545 (2008).

We conclude that the district court did not abuse its discretion when it excluded evidence of the alleged prenuptial agreement. Maria had ample time and opportunity to obtain and produce this document prior to trial, yet she did not. Maria also knew that Pedro would likely object to the document's authenticity; on multiple occasions at pretrial conferences, Pedro indicated that he believed Maria was attempting to fabricate the document with her sister, an attorney in Mexico. At trial, Maria presented an unsigned document, written entirely in Spanish, and without any translation. NRS 123A.040 requires a premarital agreement to be in writing and signed by both parties. Maria not only failed to offer any authority to support or explain how the unsigned document would be controlling, or even corroborative, but she also did not testify to the document's authenticity in any meaningful way. Namely, she did not explain the circumstances surrounding how she obtained the document or the details regarding when and how she and Pedro entered into this alleged agreement before their marriage.

Further, Maria included neither the document nor a translation as proposed exhibits from trial in the record on appeal. *See* NRAP 30(b)(3) (stating an appellant must include any "portions of the record essential to determination of issues raised in appellant's appeal"); *Cuzze v. Univ. & Cmty. Coll. Sys. of Nev.*, 123 Nev. 598, 603, 172 P.3d 131, 135 (2007)

(providing that we presume the missing portion of the record supports the district court's ruling); *see also* NRS 48.040(1)(b) (stating that error may not be predicated on a ruling excluding evidence unless a substantial right of a party is affected and the substance of the evidence was made known to the court by offer of proof). Therefore, we cannot assess the alleged document's authenticity or how it may have been a prior inconsistent statement. Consequently, we will not disturb the district court's findings that the alleged agreement was not properly authenticated and unduly prejudicial because these findings are supported by substantial evidence. *See Colman*, 136 Nev. at 113, 460 P.3d at 454.

*Maria's cross-examination of Pedro about the alleged prenuptial agreement would have constituted trial by ambush*

The district court also ruled that Maria's use of the alleged prenuptial agreement would have constituted "trial by ambush" and therefore also excluded it on those grounds. NRCP 16.2(d)(3)(P)'s mandatory disclosure requirement requires a party to provide a copy of every document or exhibit "that a party expects to offer as evidence at trial in any manner." This rule serves to prevent trial by ambush. "Trial by ambush traditionally occurs where a party withholds discoverable information and then later presents this information at trial, effectively ambushing the opposing party through gaining an advantage by surprise attack." *Turner v. State*, 136 Nev. 545, 553, 473 P.3d 438, 447 (2020) (quoting *Land Baron Invs., Inc. v. Bonnie Springs Family Ltd. P'ship*, 131 Nev. 686, 701 n.14, 356 P.3d 511, 522 n.14 (2015)).[14]

---

[14]The surprise attack is one that is so fundamentally unfair as to require a mistrial. *See, e.g., Bubak v. State*, No. 69096, 2017 WL 570931, at *4-5 (Nev. Ct. App. Feb. 8, 2017) (Order of Reversal and Remand). In *Bubak*, the district court denied a motion to continue stemming from the

While we review a district court's decision to admit or exclude evidence for an abuse of discretion, *see Klabacka v. Nelson*, 133 Nev. 164, 174, 394 P.3d 940, 949 (2017), we review decisions related to trial by ambush for palpable error, *see Sheehan & Sheehan v. Nelson Malley & Co.*, 121 Nev. 481, 492-93, 117 P.3d 219, 226-27 (2005) (stating it was not palpable error for the district court to overrule an objection of "trial by ambush" when it admitted the challenged document after finding the document had been provided to the objecting party during discovery). Judges may "exercise reasonable control over the mode and order of" evidence presentation and witness interrogation. NRS 50.115(1). We will not disturb the district court's findings if they are supported by substantial evidence. *See Colman*, 136 Nev. at 113, 460 P.3d at 454.

Here, Maria has not demonstrated that the district court abused its discretion. Maria's argument that she was attempting to introduce or use the document solely on cross-examination is unpersuasive because at no point did Maria explicitly mention impeachment. *See* NRS 50.085(3). Maria also did not preserve the error for review on appeal or otherwise explain how cross-examination about this unsigned document would have changed the trial's result. *See Wyeth v. Rowatt*, 126 Nev. 446, 465, 244 P.3d 765, 778 (2010) ("To establish that an error is prejudicial, the movant must show that the error affects the party's substantial rights so that, but for the alleged error, a different result might reasonably have been reached."); *cf.* NRCP 61 (stating that an error in excluding evidence is not

_____

late discovery of inculpatory evidence. We concluded that trial by ambush occurred because the denial directly undermined the defendant's ability to cross-examine a witness and precluded his right to a fair trial. *Id.* at *3, *5-6.

COURT OF APPEALS
OF
NEVADA

(O) 1947B

grounds for disturbing a judgment unless justice so requires). She did not, for instance, argue that she could impeach Pedro's credibility with the unsigned document itself, as he had previously denied its existence. Nor did Maria attempt at trial to make an offer of proof or submit supplemental briefing to discuss the issue and argue how she would be prejudiced by the district court's denial. *See* NRS 47.040(1)(b) (stating that error may not be predicated upon a ruling excluding evidence unless the offer made the substance of the evidence known to the court).

The district court's decision also acted as a permissible discovery sanction because the court had previously ordered Maria to timely disclose the agreement at the CMC and the January 2022 hearing on all pending motions.[15] *See* NRCP 37(b)(1)(B) (providing that a court may disallow evidence as a discovery sanction); *see also APCO Constr., Inc. v. Zitting Bros. Constr., Inc.*, 136 Nev. 569, 576, 473 P.3d 1021, 1028 (2020). Accordingly, we conclude that the district court did not abuse its discretion when it did not allow Maria to question Pedro on cross-examination about the alleged prenuptial agreement.

---

[15]At the July 2021 CMC, the district court said that the agreement needed to be produced with an official translation before the court could admit it into evidence, and at the January 2022 hearing on all pending motions, the court stated that it was "too late" for Maria to produce the agreement, as she had already had ten months to obtain the document and had not done so. *See* NRCP 16.2(j)(2)(E) (noting that each party must serve "a written list of all documents not provided under NRCP 16.2(d)" with an "explanation as to why each document was not provided"); NRCP 16.2(j)(4)(A)(viii) (providing that a CMC order may include any other necessary orders); *see also* EDCR 5.404(a)(2) (providing that a CMC order can direct disclosures and discovery requirements).

*This case will not be reassigned to a new judge*

Maria argues that this case should be reassigned to a new judge because the district court judge presiding over the case expressed a serious personal distaste towards the parties' property transactions and found both parties not credible, although she found Pedro to be more credible than Maria.

The reassignment issue is moot because we are affirming the judgment of the district court. However, even if these parties were to appear before the district court again, reassignment to a new judge would not be required. We presume judges are unbiased, and Maria has not shown bias sufficient to warrant disqualification. *See Millen v. Eighth Judicial Dist. Court*, 122 Nev. 1245, 1254, 148 P.3d 694, 701 (2006). Specifically, because the judge's comments in this case reflected opinions the judge formed during litigation—and did not originate from an extrajudicial source—Maria has not demonstrated a basis for reassignment. *See In re Petition to Recall Dunleavy*, 104 Nev. 784, 789-90, 769 P.2d 1271, 1275 (1988) ("The personal bias necessary to disqualify 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'" (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966))). Additionally, regarding the judge's opinions, Maria has not established any "deep-seated favoritism or antagonism." *Canarelli v. Eighth Judicial Dist. Court*, 138 Nev. 104, 105, 506 P.3d 334, 336 (2022); *see also Cameron v. State*, 114 Nev. 1281, 1283, 968 P.2d 1169, 1171 (1998) (noting that generally, a judge's remarks "made in the context of a court proceeding are not considered indicative of improper bias or prejudice unless they show that the judge has closed his or her mind to the presentation of all the evidence"). Accordingly, this case need not be reassigned to a new judge.

## CONCLUSION

Because we hold that the revocable inter vivos family trust did not need to be named in the divorce action or joined as a necessary party, we conclude that the district court had authority to distribute the trust's assets between the parties as community property. We also conclude that the district court did not abuse its discretion in finding that Maria failed to overcome the community property presumption by clear and convincing evidence and therefore had authority to equally divide the family trust's assets. Finally, we conclude that the district court did not abuse its discretion in denying Maria the ability to question Pedro about the alleged prenuptial agreement on cross-examination because doing so would have allowed the use of a properly excluded document and amounted to trial by ambush. Accordingly, we affirm the district court's decree of divorce.[16]

_____, C.J.
Gibbons

We concur:

_____, J.
Bulla

_____, J.
Westbrook

---

[16]In light of this decision, the partial stay entered on October 11, 2022, regarding the trust and real property, is necessarily lifted.